1
2
3
4
5
6
7
8 **UNITED STATES DISTRICT COURT**
9 **SOUTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11  PAUL WHITE, | CASE NO. 10cv1274 JM(POR) |
| 12                              Plaintiff, | ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| 13  vs. | |
| 14  RAY MABUS, Secretary of the Navy, | |
| 15                              Defendant. | |

16     Defendant Ray Mabus, Secretary of the Navy, moves for summary judgment, or, alternatively,
17 partial summary judgment, on all claims alleged in Plaintiff Paul White's Title VII Complaint.
18 Plaintiff opposes the motion. Pursuant to L.R. 7.1(d)(1), the court finds this matter appropriate for
19 decision without oral argument. For the reasons set forth below, the Court grant grants summary
20 judgment in favor of Defendant and against Plaintiff on all claims alleged in the Complaint. The Clerk
21 of Court is instructed to enter judgment in favor of Defendant and against Plaintiff and to close the
22 file.

23                              **BACKGROUND**
24     On June 15, 2011, Plaintiff filed the unverified operative complaint alleging a single claim for
25 employment discrimination based on race in violation of Title VII. (Ct. Dkt. 1). Plaintiff, an African-
26 American, has served over 30 years as a Federal civil service employee. (Compl. ¶12). At all relevant
27 times, Plaintiff served as a Freight & Cargo Supervisor at the Air Operations Department at Naval Air
28 Station North Island in San Diego, California. (Compl. ¶8).

1   As clarified in Plaintiff's opposition to the motion for summary judgment, his claims related
2   to (1) an alleged attempt by supervisors Starboard and Mobley to remove Plaintiff as supervisor of the
3   air cargo crew and (2) his two-week suspension in 2008.[1]  Commencing in February/March 2007,
4   Plaintiff alleges that a work-related overtime issue arose between Plaintiff and Air Terminal Manager
5   Louis Mobley, a Caucasian male.  (Compl. ¶¶9-10).  Plaintiff sought to secure overtime wages for his
6   subordinate workers and Mobley refused to pay the requested overtime.  Supervisors Mobley and
7   CDR Starboard met with Plaintiff and advised him that the subordinates would be paid overtime.  At
8   that meeting, CDR Starboard told "Plaintiff that he had instructed Mobley to remove Plaintiff from
9   his supervisory position and replace him with someone else.  When Plaintiff asked why this action was
10  being taken against [him], Starboard replied that he had 'heard something.'"  (Compl. ¶13).

    On March 3, 2007, CDR Starboard allegedly removed Plaintiff from his supervisory position.
On the same date, Plaintiff "went off work and onto sick leave due to the stress created by his
increasingly hostile work environment."  (Compl. ¶16).  Plaintiff met with Captains Gianni and
Heinen.  Upon return from "stress leave," "Plaintiff was returned to his supervisory position on the
Captains' orders."  (Compl. ¶17).

    On December 11, 2007, Plaintiff was involved in a forklift accident resulting in serious injury
to one of Plaintiff's subordinates.  Following an official investigation, Director Shubert, the Air
Operations Program Director responsible for disciplinary actions regarding covered personnel, found
that Plaintiff's "unsafe operation of forklift caus[ed] personal injury to another employee" and
warranted a 14-day suspension.  In broad brush, Plaintiff alleges:

> Plaintiff is informed and believes, and thereon alleges, that Defendant's suspension of his employment was excessive and abusive, and not in keeping with the level of reprimand given by Defendant to other employees who were responsible for accidents of the same or greater degree than the December 11th incident for which Defendant suspended Plaintiff.

(Compl. ¶30).  Such suspension, Plaintiff alleges, was on account of his race as an African-American.
(Compl. ¶¶31-33).

    The parties have completed discovery.  Before addressing the legal issues, the court reviews

---

[1] As noted by Plaintiff during discovery, Plaintiff's "claim would be limited to the attempted removal by Starboard and Mobley, his back sick leave, and his suspension in 2008." (Oppo. at p.5:13-14).

1  the evidentiary record.

2  <u>The 2007 Incidents</u>

3  During 2007, Defendant was involved in three work-related incidents. In February 2007, Plaintiff and his crew were using a K-loader, a mechanized self-propelled loading dock, to unload metal pallets from a Navy C-9 cargo aircraft. (White Depo. 86:1-25). Plaintiff secured one of the pallets to a K-Loader with a cargo strap. He then turned his back to the K-Loader in order to talk to someone inside the aircraft. While he was talking, he heard the pallet crash to the tarmac. The strap securing the pallet was in good condition but Plaintiff had fastened it in such a way that the pallet cut through the strap, causing it to fail. <u>Id.</u>, 95:5-96:10. The accident caused $36,000 in damages. (Starboard Decl. ¶2).

The second accident, on June 18, 2007, occurred when Plaintiff operated a truck-mounted boarding ramp. (White Depo. 105:5-11; 111:3-8). When an aircraft was ready to depart, Plaintiff climbed into the stair truck and tried to back it away. Because the aircraft took on cargo or fuel, the aircraft rested lower than it did when the stair truck was originally parked. Plaintiff testified that his crew did not know that the stair truck was stuck until he tried to bring the stair down. (White Depo. at p.115: 1-22). They used a pry bar to free the stair truck, damaging the C-4 in the process. That day's flight was cancelled and the damaged door was repaired the next day. (<u>Id.</u> at p. 116:19-117:2).

The third incident, on December 11, 2007, occurred when Plaintiff and his crew were attempting to unload a diving bell, Navy Deep Submersible Unit ("DSU"), from a Boeing 747. (White Depo. 61:2-10). Items such as diving bells are heavy, bulky, sensitive and expensive, and require special packaging and handling. On the date of the incident, Plaintiff was the only cargo handler involved in the incident who had ever unloaded DSU equipment. (<u>Id.</u> 68:1-5, 70:12-18). Further, his new subordinates had never received any formal training to unload DSU equipment. Plaintiff testified that some of his crew did understand enough to safely unload the diving bell while others did not. (<u>Id.</u> 77:6-14).

Initially, Plaintiff planned to supervise the offload, but not personally operate any equipment. Plaintiff selected a 25,000 pound K-Loader and a second mobile loader, known as a "tact loader," for

1  the operation. As the DSU equipment was being off-loaded, the pallets of the three-pallet train got
2  stuck, resting partially on the K-Loader and partially on the tact loader. To free the diving bell,
3  Plaintiff took the controls of a 20,000 pound forklift and maneuvered it in position to push the stuck
4  pallet from the K-Loader to the tact loader. The procedure, known as the "pit maneuver," involves
5  using the 20K forklift to push the pallet at an angle to free it from the roller of the tact loader. (Id.
6  161:2-162:7). No one on Plaintiff's crew had been trained in the pit maneuver. (Id. 162:8-11).

7  One worker, Bernard Garcia, stepped into a gap between the forklift's left rear wheel and the
8  K-Loader's steel frame. (Id. 164:17-165:4). Even though Plaintiff generally told the riggers and
9  spotters to watch out for him, no worker was stationed in such a position to observe Mr. Garcia. When
10 Plaintiff moved the forklift, it ran over Mr. Garcia's leg, seriously injuring him. (Id. 180:2-23).

11  <u>The Attempt to Remove Plaintiff From his Supervisory Position</u>

12  In early March 2007, CDR Starboard learned about the February 2007 incident wherein a
13 cargo plane being unloaded by Plaintiff and his crew suffered damages in the amount of $36,000.
14 (Starboard Decl. ¶2). CDR Starboard explains, that as of March 2007, he "was unsatisfied with Mr.
15 White's overall performance as a supervisor." (Starboard Decl. ¶3). By this time, CDR Starboard had
16 additionally learned that Plaintiff was still in his first-year probationary period and that there were
17 some "irregularities regarding timekeeping and scheduling in Mr. White's unit." (Id. at 4).
18 In February 2007, Mr. Mobley and Plaintiff had a disagreement whether Plaintiff had properly
19 recorded the time cards of his crew. (White Depo. 267:1-16).

20  On March 3, 2007, CDR Starboard and Mr. Mobley met with Plaintiff to discuss his job
21 performance. Plaintiff testified that they spoke about the overtime issue to his crew and the
22 applicability of the so-called 59 minute rule. CDR Starboard then stated that there is a report in
23 Plaintiff's personnel file indicating that he was involved in a January 2007 accident and that he had
24 in his possession a letter indicating that Plaintiff was negligent in carrying out his duties on the date
25 of the accident. (White Depo. 363:13-22). CDR Starboard told Plaintiff that "I don't think you are
26 a good Supervisor." (Id. 273:2-5). He also told Plaintiff that "I am instructing Mobley to replace
27 you." (Id. 367:2-7).

28  Immediately following the meeting, Plaintiff elected to go home and was out on sick leave

1  from March 3, 2007 through June 5, 2007. (White Depo. 273:10-12; 274:2-7). When Plaintiff left
2  the work site, he informed Mr. Mobley to put him on annual leave for the day. A few days later he
3  called the workplace and requested to be placed on sick leave. (Id. 274:2-23). When Plaintiff returned
4  to work, he assumed his regular supervisory responsibilities.

5  Following the March 3, 2007 meeting, CDR Starboard and Mr. Mobley requested assistance
6  from the Human Resources Office ("HRO") to remove Plaintiff from his supervisory position on
7  account of performance deficiencies. In order to remove an employee, HRO would have to issue a
8  Notification of Personnel Action, known as a Standard Form 50. Director Shubert "was concerned
9  that certain procedural steps had not been taken before attempting to remove" Plaintiff. (Shubert Decl.
10 ¶16). The procedural steps include documenting the employee's performance deficiencies, providing
11 the employee with an unsatisfactory performance appraisal, counseling the employee, and offering
12 the employee an opportunity to improve. Id. Consequently, Plaintiff never received a Standard Form
13 50. Plaintiff was neither demoted, removed, nor terminated.

14  <u>Investigation of the Diving Bell Accident</u>

15  Pursuant to standard operating procedures applicable to injury-producing workplace incidents,
16 a neutral Naval Officer, Lieutenant Joseph Gonzalez, was appointed to conduct an official
17 investigation into Mr. Garcia's injuries. Lieutenant Gonzalez obtained 10 written statements from
18 witnesses and conducted eight personal interviews. The report provided the following summary:

19/20  An overall assessment of the operation conducted on 11 December 2007, indicates that Mr. White operated the 20K forklift in an unsafe manner resulting in personal injury to Mr. Garcia. Although this incident has been labeled an accident, the actions of Mr. White directly contributed to this unfortunate event.

22  (Exh. 6, Summary). Among other things, the investigation opined that Plaintiff (1) did not instruct
23  personnel to clear the area before operating the forklift; (2) did not get off the forklift to check
24  between the two machines to determine whether the area was clear before operating the forklift; (3)
25  communicated with Mr. Garcia by hand signal and eye contact before operating the forklift; and (4)
26  did not intentionally cause injury to Mr. Garcia. (Exh. 6).

27  <u>Plaintiff's 14-Day Suspension</u>

28  Based upon Lt. Gonzalez' Report of Investigation, on April 2, 2009, acting air Operations

1  Officer, Lt. Commander William M. Wehrmeyer provided Plaintiff with Notice of Proposed
2  Suspension ("Notice"). (Exh. 7). The reason given for the 14-day suspension was the "Unsafe
3  operation of forklift causing personal injury to another employee." (Id.). The Notice noted that this
4  was considered to be Plaintiff's first offense of misconduct. The Notice also indicated that Lt.
5  Commander Wehrmeyer considered several mitigating and aggravating factors in proposing the 14-
6  day suspension. Not only did Lt. Commander Wehrmeyer consider the nature and seriousness of the
7  offense, but he also considered that Plaintiff's role as a supervisor has a direct effect on the safety of
8  himself and others; Plaintiff works in a dangerous environment which requires the safe operation of
9  equipment to avoid severe hazard to the people working in the vicinity; Plaintiff personally operated
10 a forklift with an expired license; Plaintiff's lack of training and his improper licensing evidenced
11 deficiencies in his supervisory oversight; Plaintiff had 30 years of federal civilian experience; and
12 Plaintiff received a "fully successful" rating on his last performance appraisal. (Exh. 7).

13 On May 29, 2008 Plaintiff responded to the Notice, indicating that Lt. Commander Wehrmeyer
14 "may not understand" proper safety standards to handle freight and cargo. Plaintiff also represented
15 that before he moved the forklift, everyone in the area was told to clear out of the way. He also
16 represented that Mr. Mobley, Plaintiff's first-level supervisor, was on duty that night and that he was
17 intoxicated on the night of the incident. (Exh. 8). At his deposition, Plaintiff testified that Mr. Mobley
18 was not on the scene during the operation. (White Depo. 246:18-24). Plaintiff did not claim that
19 discrimination played any role in the investigation.

20 Air Operations Program Director, Christiane White, nee Shubert, was the deciding individual
21 regarding Plaintiff's suspension. Prior to receipt of the Notice, Director Shubert was not aware of
22 Plaintiff's conduct on the date of the incident, December 11, 2007. (White Decl. ¶4). In reaching her
23 decision to suspend Plaintiff, Director Shubert considered the Notice, the investigative report, the
24 witness statements, Plaintiff's response, and an interview with Plaintiff. At no time did Plaintiff
25 acknowledge that he had engaged in misconduct, or that misconduct played any role in the December
26 11, 2007 incident. (Shubert Decl. ¶6). Based upon her investigation, Director Shubert determined that
27 the charge of "unsafe operation of forklift causing personal injury to another employee was supported
28 by the evidence and warranted a 14-day suspension." (Shubert Decl. ¶8).

1  ///

2  ///

3                                              **DISCUSSION**

4  **Legal Standards**

5         Summary Judgment

6         A motion for summary judgment shall be granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Prison Legal News v. Lehman, 397 F.3d 692, 698 (9th Cir. 2005). The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the file which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials <u>negating</u> the opponent's claim." Id. (emphasis in original). The opposing party cannot rest on the mere allegations or denials of a pleading, but must "go beyond the pleadings and by [the party's] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (citation omitted). The opposing party also may not rely solely on conclusory allegations unsupported by factual data. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

       The court must examine the evidence in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Any doubt as to the existence of any issue of material fact requires denial of the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). On a motion for summary judgment, when "'the <u>moving party</u> bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence were uncontroverted at trial.'" Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992) (emphasis in original) (quoting International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir. 1991), cert. denied, 502 U.S. 1059 (1992)).

       Title VII Discrimination

       Under Title VII, it is unlawful for an employer to discriminate with respect to an individual's

"compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. §2000e-2(a)(1). The parties do not dispute that the McDonnell Douglas burden shifting approach applies to Plaintiff's Title VII discrimination claim.

> Under that framework, the burden of production first falls on the plaintiff to make out a prima facie case of discrimination. He may do so by showing that (1) he belongs to a protected class, (2) he was qualified for the position he held (or for the position to which he wished to be promoted), (3) he was terminated or demoted from (or denied a promotion to) that position, and (4) the job went to someone outside the protected class. The burden of production then shifts to the employer, who must present evidence sufficient to permit the factfinder to conclude that the employer had a legitimate, nondiscriminatory reason for the adverse employment action. Finally, if the employer meets that burden, then the McDonnell Douglas framework drops out of the picture entirely, and the plaintiff bears the full burden of persuading the factfinder that the employer intentionally discriminated against him. Id. at 507-08, 113 S.Ct. 2742. (citations omitted)

Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1094 (9th Cir. 2005); Wallis v. J.R. Simplot Co., 26 F.3d 885, 890-91 (9th Cir. 1994). For a prima facie case, a plaintiff must either offer direct or circumstantial evidence of discriminatory intent or, alternatively, satisfy the McDonnell Douglas framework. Vasquez v. County of Los Angeles, 349 F.3d 634, 640 (9th Cir. 2003). Plaintiff must also establish a causal connection between his protected characteristic and the employment decision at issue. Id.

**The Attempted Demotion Claim**

Prima Facie Case of Discrimination

Plaintiff may establish a prima facie case of unlawful discrimination by coming forward with direct or circumstantial evidence of discriminatory intent or, alternatively, by satisfying the McDonnell Douglas formation. Vasquez, 349 F.3d at 640. Plaintiff cites no direct or circumstantial evidence of discriminatory intent. Plaintiff declares that at the March 3, 2007 meeting with CDR Starboard and Mr. Mobley, "Starboard told me I was relieved of my duties as a supervisor because he had 'heard things' about me. I was given no opportunity to defend myself nor was I even told a real reason for the employment action." (White Decl. ¶8). Plaintiff's deposition testimony supplements the declaration. Plaintiff testified that CDR Starboard discussed the February 2007 accident which resulted in $36,000 damages and told him that he did not believe that he was a good supervisor. (White Depo. 273:2-5). This evidence reveals that Plaintiff was informed of reasons for

his demotion. Plaintiff further testified that he never had any negative interactions with CDR Starboard nor did CDR Starboard suggest that the attempted demotion had anything to do with race. (White Depo. 274:2-4; 274:24-275:3' 315:21-23). As Plaintiff fails to identify sufficient evidence of discriminatory intent, the court turns to the McDonnell Douglas formulation.

Under the McDonnell Douglas test, Plaintiff comes forward with evidence to show that (1) he belongs to a protected class (African-American), and (2) he was a qualified supervisor. The third prong requires Plaintiff to show that he suffered a negative employment consequence, such as a demotion, termination, suspension, or denial of a promotion. While CDR Starboard informed Plaintiff that he had instructed Mobley to replace him as a supervisor, the demotion never occurred. CDR spoke with HRO concerning Plaintiff's demotion but HRO, acting through Director Shubert, informed CDR Starboard that not all procedural requirements had been satisfied in order to issue a Notification of Personnel Action. Plaintiff was never demoted, terminated, nor reassigned. There was simply no change in Plaintiff's conditions of employment, only an attempted change in the conditions of employment.

While Plaintiff uses quotation marks to represent that he was "demoted" or "removed," (Oppo. at p.3:25), the court notes that the demotion is illusory because it indisputably never occurred. That does not mean, however, that Plaintiff did not suffer negative consequences. Upon conclusion of the meeting, Plaintiff declares that he "went out on stress leave." (White Decl. ¶9). Plaintiff sheds no further light on why he did not return to work for two months or the nature of his "stress." The court notes that Title VII does not provide a private right of action to employees who experience job-related stress. Rather, Title VII makes it unlawful for an employer to discriminate with respect to an individual's "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. §2000e-2(a)(1). Plaintiff simply does not identify any terms, conditions, or privileges of employment that were altered as a result of the attempted demotion.

The last prong of the McDonnell Douglas test requires Plaintiff to show that his position went to someone other than an African-American. Here, once Plaintiff returned from his voluntary "stress" leave, he assumed the same supervisory position as before. Plaintiff was not replaced. Plaintiff

1  appears to argue that he satisfies this prong because, while out on "stress" leave, he was temporarily
2  replaced by a European-American. He declares that there were several qualified African-Americans
3  on his crew but the temporary position went to "a less-experienced White man, James Boyer." (White
4  Decl. ¶9). Plaintiff also asserts the theory that he "was replaced at the behest of Mr. Underhill, acting
5  through Mr. Mobley who was indebted to Underhill for covering up his drinking." Id.   Again,
6  Plaintiff's supervisory position was not filled by anyone else. The Government of necessity was
7  compelled to cover the supervisory position during Plaintiff's voluntary temporary absence.
8     In sum, the court concludes that Plaintiff fails to establish a prime facie case of discrimination.

<u>Defendant's Reasons For the Attempted Demotion</u>

10  Even assuming Plaintiff establishes a prima facie case, the Government comes forward with
11  sufficient admissible evidence to show that there were legitimate reasons for the attempted demotion.
12  The evidence shows that CDR Starboard sought to remove Plaintiff from his supervisory position
13  because he was still on the one-year probationary period, he was involved in a damage causing injury
14  in February 2007, he did not believe that Plaintiff was a good supervisor, and there were irregularities
15  regarding timekeeping and scheduling. (Starboard Decl. ¶2-3). It was only after CDR Starboard
16  contacted HRO that he learned that there were procedural requirements that had to be satisfied,
17  including the issuance of a Notification of Personnel Action, before demoting Plaintiff. While
18  Plaintiff was still in the probationary period as supervisor, Director Shubert declares that any
19  unsatisfactory job performance should be adequately documented, the employee should be provided
20  with counseling, and the employee should be offered training opportunities to improve. (Shubert
21  Decl. ¶16). As these steps had not been followed, no Notification of Personnel Action issued. Id. The
22  court finds that the reasons articulated for the attempted demotion are legitimate and race-neutral.
23  Therefore, the burden shifts to Plaintiff to show that the proffered reasons are pretextual.[2]

24  The only evidence submitted by Plaintiff consists of his declaration wherein he represents:

> I am certain this employment action was motivated by race as several of the men (some of them Black) in my crew could have taken over the supervisor position, but the job was given to a less-experienced White man, James Boyer. Upon information and

---

[2] In hindsight, one may argue that CDR Starboard should have consulted with HRO prior to seeking to demote Plaintiff. However, Title VII is not intended to "diminish traditional management prerogatives." <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 259 (1981).

> belief, Boyer was close with Mr. Underhill and Underhill took pleasure in his replacing me, particularly because I was the only African American supervisor at the Air Terminal. Essentially, I was replaced at the behest of Mr. Underhill, acting through Mr. Mobley who was indebted to Underhill for covering up his drinking.

(White Decl. ¶9). Defendant raises several evidentiary objections to this statement based upon hearsay and lack of personal knowledge. A statement made upon information and belief is not the same as one made from personal knowledge and therefore not admissible. See Fed.R.Civ.P. 56(c)(2). Further, the statement that certain members of his crew (consisting of black, white, and Hispanic workers) could have taken over the supervisor position but that the temporary position was given to a white male fails to establish that the proffered reasons are pretextual.[3]

Defendant also declares:

> It is extremely clear to me that I was singled out for disparate treatment, and because of my experience working with the people involved since 2006 can state of my own knowledge that one of the major reasons for this treatment was my race.

(White Decl. ¶12). This statement fails to identify the basis for Plaintiff's belief that "it is extremely clear to me that . . . race" played a role in the attempted demotion. Plaintiff's burden is not to express his "beliefs" that he was a victim of racial discrimination. Rather, Plaintiff must come forward with admissible evidence to show that the proffered reasons for the attempted demotion were pretextual. Plaintiff fails to meet this burden.[4]

In sum, the court grants the motion for summary judgment on the attempted demotion claim.

**The 14-Day Suspension**

Prima Facie Case of Discrimination

As Plaintiff does not submit any admissible direct or circumstantial evidence of discriminatory intent, the court applies the McDonnell Douglas formulation. Here, Plaintiff establishes that he belongs to a protected class, he was qualified for the position, and he suffered a negative employment consequence, a 14-day suspension. A plaintiff may also create a genuine issue of material fact by showing that he was treated worse than similarly situated employees outside his protected class. See

---

[3] The statement to the effect that Mr. Mobley sought to replace him as a favor to Mr. Underhill for covering up his drinking does not support a finding of racial animus.

[4] The court rejects Plaintiff's argument that the complaint's allegations support his Title VII claim.

1  Biolchini v. General Electric Co., 167 F.3d 1151, 1154 (7th Cir. 1999).  Plaintiff argues that his
2  suspension was not warranted because other employees had engaged in more serious conduct and did
3  not suffer any suspension.

> There is no way to interpret my suspension as anything but racially motivated as virtually everyone else at the Air Terminal had behavioral incidents more serious than mine that did not involve a suspension, to wit: Mobley's drinking issues, Underhill's having at least four times been accused of sexual harassment, Boyer hitting the gate of a 12-foot fence with a 20K forklift and driving a 20K forklift behind a C17 in order to off load it, and Viki Callison (Underhill's girlfriend) throwing two television sets to the floor in the employee's lounge in an altercation with a co-worker.  In other words, suspension was rare even in cases of wanton misconduct; yet I was suspended for an accident involving no actual misconduct.

(White Decl. ¶10).  Plaintiff also argues that there were other incidents of serious misconduct involving non-African-Americans resulting in suspensions with pay. (White Decl. ¶11). In addition, Plaintiff identifies seven individuals and then sets forth the basis for the suspension, i.e. waste, fraud, internet gambling, viewing child pornography, racial slander, assault on co-worker. Id.

There are three difficulties with Plaintiff's evidentiary submission.  First, as noted by Defendant, Plaintiff fails to set forth an adequate foundation for the incidents involving other co-workers.  Second, the statements are hearsay.  Third, and most critically, Plaintiff fails to show that any of these employees are similarly situated.  None of the identified individuals were involved in any misconduct giving rise to physical injuries to co-workers or subordinates.  The evidentiary record also shows that Plaintiff was involved in three work-related accidents in 2007.  He was only disciplined for the serious injuries received by Mr. Garcia, and not for the property damage accidents.  Plaintiff's failure to establish that other non-protected co-workers involved in serious injury producing accidents were treated differently than he is fatal to his claim.

In sum, Plaintiff fails to establish a prima facie case of discrimination.

<u>Defendant's Reasons For the Attempted Demotion</u>

Even assuming Plaintiff establishes a prima facie case, the Government comes forward with sufficient admissible evidence to show that there were legitimate reasons for the 14-day suspension. The Government establishes that Director Shubert made the decision to suspend Plaintiff because of his involvement in the serious injury to Mr. Garcia.  In reaching her decision to suspend Plaintiff, Director Shubert considered the Notice of Proposed Suspension, the investigative report prepared by

Lt. Gonzalez, the witness statements, Plaintiff's response, and an interview with Plaintiff. (Shubert Decl. ¶6). Based upon her investigation, Director Shubert determined that the charge of "unsafe operation of forklift causing personal injury to another employee was supported by the evidence and warranted a 14-day suspension." (Shubert Decl. ¶8).

In large part, the decision to suspend Plaintiff was based on the investigative report prepared by Lt. Gonzalez and reviewed by Lt. Wehrmeyer. The report provided the following summary:

> An overall assessment of the operation conducted on 11 December 2007, indicates that Mr. White operated the 20K forklift in an unsafe manner resulting in personal injury to Mr. Garcia. Although this incident has been labeled an accident, the actions of Mr. White directly contributed to this unfortunate event.

(Exh. 6, Summary). Plaintiff testified as to his belief that the decisions of Lt. Gonzalez, Commander Wehrmeyer and Director Shubert were not based on racial animosity or race. (White Depo. 434:16-18; 434:22-25). CDR Starboard was not directly nor indirectly involved in the decision to suspend Plaintiff. (Starboard Decl. ¶12). Based upon this evidentiary record, the burden shifts to Plaintiff to show that the proffered reasons are pretextual.

Defendant argues that his truthful testimony about Lt. Gonzalez should not be held against him. Further, Defendant argues that the evidence submitted by Defendant "contravenes his very real belief that Commander Starboard had a role in his suspension." (Oppo at p.5:3-4). The difficulty with this argument is that Plaintiff must come forward with admissible evidence to show that the proffered reasons are a pretext for discrimination. Plaintiff cannot meet his evidentiary burden by setting forth his unsupported beliefs. Fed.R.Civ.P. 56(c). The court notes that the parties have had many months to conduct discovery. From the evidentiary record, however, it does not appear that Plaintiff took the deposition of any potential witness (such as CDR Starboard, Lt. Gonzalez, Commander Wehrmeyer, or Director Shubert). Plaintiff's evidentiary failure is fatal to his claims.

In sum, the court grants summary judgment in favor of Defendant and against Plaintiff. The Clerk is instructed to close the file.

**IT IS SO ORDERED.**

DATED: November 28, 2011

Hon. Jeffrey T. Miller
United States District Judge